*547 OPINION.
Leech :
The primary issue is whether or not petitioner may deduct in the taxable year a loss due to worthlessness of Orpheum preferred stock. The law is clear that the loss may be deducted only in the year in which it was sustained. There must be something identifiable to mark the period. United States v. White Dental Manufacturing Co., 274 U. S. 398. The rule is clear, only its application is difficult.
Respondent determined that the preferred shares of Orpheum became worthless prior to 1937, the year in which petitioner asserts his right to deduct the loss. It is, of course, the petitioner’s burden to overcome the prima facie correctness of that determination and to show that these shares became worthless during 1937. This burden may be met by proof that the stock had value either at the end of 1936, Mark D. Eagleton, 35 B. T. A. 551; afld., 97 Fed. (2d) 62, or that it had value at the beginning of 1937, Roosevelt Investment Corporation,, 45 B. T. A. 440, and that it lost such value during that year. But this value means, not necessarily intrinsic value of the assets applicable to the stock, but may include the market value of the stock. Rice v. Eisner, 16 Fed. (2d) 358.
Respondent points to Lambert v. Commissioner, 108 Fed. (2d) 624, which affirmed the memorandum opinion of this Board holding that the same stock became worthless prior to 1934. However, the proceeding now before us, involving an issue of fact, must be decided wholly on the present record, which is much more complete than that in the Lambert case. Here it is disclosed that Orpheum had paid dividends regularly on its preferred shares from the date of its organization in 1920 until October, 1931, when it defaulted. K. A. O. then owned all the common shares of Orpheum, and R. K. O., in turn, owned all the common shares of K. A. O. The three companies had the same officers and were operated as a single enterprise. Large loans had been made to Orpheum by K. A. O. By October 1, 1932, these loans amounted to $2,880,000 and most of Orpheum’s assets had been assigned to K. A. O. as security therefor. Petitioner and many other preferred shareholders, as well as bondholders, bank and other *548 creditors, were dissatisfied with the management being given to the company by R. K. O. Committees were organized in 1932, to protect their interests. The position of these committees was that the officers and directors of Orpheum had been guilty of waste and mismanagement and were liable to damages therefor, that the notes given by Orpheum to K. A. O. were not valid obligations of Orpheum and that the transfer of Orpheum assets collateralizing those notes was likewise, therefore, invalid.
Early in 1933, the Orpheum notes and securing assets were transferred to Stadium. On January 27,1933, Orpheum filed a voluntary petition in bankruptcy and, as a matter of course, a formal adjudication was made on the same day. Its schedules, filed at that time, showed it to be solvent by about five and one-half million dollars. Certainly that adjudication afforded no basis for a determination of worthlessness of Orpheum preferred stock. Burnet v. Imperial Elevator Co., 66 Fed. (2d) 643; Peoples National Bank v. Foltz, 25 Fed. (2d) 295; Edward C. Lawson, 42 B. T. A. 1103; Sterling Morton, 38 B. T. A. 1283; affd., 109 Fed. (2d) 47; W. C. Coleman, 31 B. T. A. 319; J. Harvey Ladew, 22 B. T. A. 443; Jamies L. Byrd, 21 B. T. A. 1183. That conclusion is corroborated emphatically by several facts. On January 28, 1933, one day after the bankruptcy adjudication, the stock sold at $3 per share on the New York Stock Exchange while on June 14, five months later, the market had risen to $6 per share. Throughout 1933, after this adjudication, the preferred shareholders of Orpheum had an existing right under an offer by R. K. O. to exchange each share of their preferred stock for two shares of common stock of the latter company. This offer was later increased to three shares of R. K. O. common stock for one preferred share of Orpheum. Neither of these offers was accepted by petitioner and the other holders of more than 43,000 of the 53,378 shares of Orpheum preferred stock in the hands of the public, because they believed Orpheum preferred stock had a value in excess of the R. K. O. stock for which it could be exchanged.
In 1934 and 1935, conditions continued substantially the same. The assets of the bankrupt were being managed by the trustee. The preferred shareholders, as well as the bondholders, were organized to protect their investments. Committees representing them, as well as a bank creditor acting for itself, had made several efforts to have suit brought against the officers and directors of Orpheum, who were likewise officers and directors of K. A. O., R. K. O., and Stadium, to have the notes of Orpheum to K. A. O., together with the transfer of Orpheum’s assets securing the notes, then in the hands of Stadium, declared invalid, and to recover damages from such officers for mismanagement and waste. But these efforts were not fruitful. The *549 officers of E. K. O. continued their assurances, begun in 1933, that the interests of the preferred shareholders would not be served by such suits and that their equity would be recognized by providing for their participation in the reorganization of R. K. O. in the 77B proceedings. Both the referee in bankruptcy and the District Court lent weight to this advice by denying for that reason and without prejudice petitions asking the referee to direct the trustee in bankruptcy to bring such suits. Finally, in 1936, on the repeated filing of such petitions, the referee in bankruptcy entered an order directing that such suits be instituted by or in the name of the trustee in bankruptcy. However, a petition for review of this order was filed and no order was ever entered thereon by the District Court. The assurances from the officers of E. K. O. continued, however, until late in 1936, when the plan of reorganization of E. K. O. was filed in the District Court in the then pending 77B proceedings. This was the first plan of reorganization filed in those proceedings and made no provision for participation by the preferred stockholders, of Orpheum. See Edward C. Lawson, supra. Following that closely, in December of 1936, the offer to purchase the assets of Orpheum was made by Stadium, the holder of Orpheum’s notes and assets. In order to pass upon this offer, the assets of Orpheum were appraised for the first time early in 1937. The value of these assets was there shown to be considerably less than the claims which had been filed against Orpheum in the bankruptcy proceeding.
Following this appraisal came the orders of the referee in bankruptcy on February 18, 1937, directing the trustee to accept the offer by Stadium and dismissing the petition of the committee filed January 25, 1937, under which orders the assets of Orpheum were transferred to Stadium, leaving nothing for the preferred shareholders of Orpheum and no hope for participation in the reorganization of E. K. O., which had been assured to them. See Sterling Morton, supra. Then came the order of the District Court on June 11,1937, affirming these orders of the referee. Petition for leave to appeal from this decision to the Circuit Court of Appeals was denied on July 30, 1937.
The preferred stock of Orpheum was removed from the New Tork Stock Exchange June 20,1933. But this was only because it no longer had a transfer agent in New York City. However, the stock was traded in the over-the-counter market thereafter until sometime in 1937. The records of actual sales during 1936 and 1937, as well as the bid and asked prices for this stock during those years, closely parallel the history of this company during that period, and they are therefore entitled to real evidentiary weight. Rice v. Eisner, supra. Cf. John B. Marsh, 38 B. T. A. 878. Though the actual purchases and sales disclosed during that period in this record were made by one firm *550 of stockbrokers, those purchases and sales were made from and to at least six different brokerage firms.
Between November 7, 1936, and June 1, 1937, 116 shareholders, owning 13,846 shares of the 18,000 shares of Orpheum preferred stock represented by the committee, contributed $13,845, or $1 per share, for the purposes of the committee. Petitioner contributed $1,720.
We think petitioner has met his burden. This record establishes to our satisfaction (1) that Orpheum preferred stock had a market value at the close of 1936 and the beginning of 1937 and (2) that such stock became worthless during 1937, as we have found. Respondent is reversed on this issue.
The second issue is whether or not petitioner is entitled to deduct certain amounts from gross income of the taxable year as ordinary and necessary expenses of a trade or business. This issue arises from an affirmative pleading by respondent in his amended answer. Consequently, respondent has the burden of proving that he erroneously allowed the deductions in question.
The evidence shows that petitioner was engaged in activities involving real estate and investments in two corporations. It may be that both of these activities constituted a trade or business of petitioner. In any event, respondent has failed to prove that they did not. Where expenses are incurred in activities which are business and nonbusiness in nature an allocation ,of expenditures may be made. Higgins v. Commissioner, 312 U. S. 212. Here respondent has not shown the basis for a proper allocation. We may assume, therefore, that petitioner was engaged in a trade or business and that expenses incurred therein may be deductible.
We are of the opinion, however, that the sum of $250 expended for change of title registration is not a proper deduction but should be reflected in the basis of the property to which it related. Petitioner concedes on brief that only 80 percent of the salary deduction should be allowed. Adjustments covering these items should be made. Ke-spondent has not proved that the other amounts deducted under “Other deductions authorized by law” were improperly allowed by him.
Reviewed by the Board.

Decision will be entered u/nder Bule 50.